CONSOLIDATED WATER POWER & PAPER CO. v. SPARTAN AIRCRAFT CO.

No. 10202.

United States Court of Appeals, Third Circuit.

Argued Nov. 6, 1950.

Filed Dec. 13, 1950.

---

David S. Hecht, New York City, (Richards, Layton & Finger, Wilmington, Del., Caleb S. Layton, Wilmington, Del., of counsel, Leve, Hecht, Hadfield & McAlpin, New York City, Barnabas B. Hadfield, C. Lansing Hays, Jr., New York City, on the brief), for appellant.

R. B. Graves, Wisconsin Rapids, Wis. (T. W. Brazeau, Wisconsin Rapids, Wis., William Prickett, Wilmington, Del., on the brief), for appellee.

Before GOODRICH, KALODNER and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

This case involves the responsibility of a seller to a buyer either for breach of warranty or a statutory liability in the nature of an action for deceit. The seller won in

the trial court and the buyer appeals to us on the basis that the conclusion reached by the learned Trial Judge is clearly erroneous under Rule 52(a).[1]

The case is in federal court because of diversity only. Plaintiff seller is a Wisconsin corporation with its principal place of business in that state. The defendant buyer is a Delaware corporation and its principal place of business is in Oklahoma. In this type of case we take our choice of law rules from the state in which the court sits. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. The parties in this case have endeavored to provide choice of law rules by the novel expedient of stipulating that breach of warranty matters are to be governed by the laws of Wisconsin and that liability for misrepresentation in the nature of fraud is to be governed by the law of Oklahoma. While the stipulations of parties in the contract as to choice of law governing a contract are sometimes given effect by courts, no stipulation made after litigation has begun as to the law which is to determine it has ever been upheld so far as we know. Nor do we think it likely to be. The stipulation should be disregarded and we think from the way counsel backed away from it at oral argument that they think so too. It has little bearing on the case anyhow. As will be demonstrated below, the Oklahoma statute upon liability for innocent misrepresentation does not become operative on the facts of this litigation. To the extent we disregard the stipulation we disagree with the trial court's conclusions of law. This does not affect the outcome of the case however because, as will be seen, it depends upon examination of facts, not rules of law.

The defendant buyer, Spartan Aircraft Company, was, in 1946, engaged in the manufacture of a trailer for human habitation which was called by the fancy name of "Spartan Manor." When it could get plywood it supplied a $3/4''$ or $5/8''$ floor of plywood for the trailers, insulated below the floor with material called Kimsul (or sometimes Celotex). When plywood was unavailable Spartan used a matched lumber flooring consisting of ordinary boards grooved together. This, too, was insulated below. Whether plywood or this matched wood was used, a cover of waterproof substance designed to protect the floor insulation from the weather was placed underneath the insulation.

Plywood was very hard to get in 1946. Through a man named Folk, who served as a sort of broker for scarce materials, the plaintiff's salesman and the defendant's purchasing agent were brought together through a visit by the plaintiff's salesman to the defendant's factory in the latter part of March, 1946.[2] The seller's salesman, Plzak, came armed with some samples of material called "Consoweld." It is a plastic made of sheets of paper, mixed with adhesive material and run through a heating and rolling process.[3] As a result of this salesman's visit there was shipped soon thereafter to the Spartan people several sets of $1/4''$ Consoweld cut to fit the floor of Spartan Manor trailers. This shipment was followed by others and Spartan, through the months which followed, gave Consolidated additional orders for flooring material up to and including June 13, 1946.[4] On November

---

1. Fed.R.Civ.P. 52(a), 28 U.S.C.A. "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

2. Spartan has made something of the failure of the plaintiff to call Folk as a witness. We think this failure has no significance. Folk brought buyer and seller together and the fact that he afterwards persuaded the seller to pay him a fee for the services does not make him a significant actor in this drama. His two-line speech was made early in the play. We see no reason why he should have remained around for a curtain call.

3. In making Consoweld paper is treated with resin, run through an oven by means of an endless conveyor, placed on rolls and subjected to pressure. It is then cut into sheets which are laid up in mats, the number of sheets in each mat being determined by the thickness of the material desired.

4. As late as November 14 Spartan requested acceleration of deliveries under this order.

25, 1946, Spartan gave notice of cancellation of the undelivered portion of the last order.[5] No complaint was made by the buyer at that time concerning any breach of warranty on the part of the seller.

The buyer had paid for a substantial portion of the flooring material purchased. It refused to pay for the rest and when sued, set up a defense and counterclaim (1) breach of express warranty, (2) breach of implied warranty, (3) statutory liability in the nature of deceit, as provided in the Oklahoma statute.[6] Judgment went for the seller for the unpaid balance of the purchase price and against the buyer on the counterclaim.

Some of the interesting facts are undisputed. A test of the tensile strength of Consoweld was made in salesman Plzak's presence in the Spartan factory. The test showed the flooring was strong enough for a floor and no complaint is made on this point. It is likewise undisputed that after this plastic material began to arrive at the factory, Spartan, following the direction of Mr. Getty, the President, eliminated the insulating material and the wooden cross pieces from beneath the floor, likewise the strip of covering which previously had been fastened beneath the insulation. The Consoweld was laid directly on the metal frame of the trailer. It is likewise undisputed that some doubts concerning the suitability of this thin floor without insulation arose in the minds of trailer retailers. They made their doubts known to a man named Boynton, who was a distributor of Spartan and other trailers to retailers. He brought the doubts to Spartan. This was some time after contracts between buyer and seller had been made and when the trailers were in active production with this ¼" Consoweld floor laid on the metal supports. Another fact which is abundantly brought out by the testimony is that these uninsulated Consoweld floors were very cold in low temperatures. There is much testimony concerning work done by Spartan crews in insulating these trailers during the cold weather in the winter which followed their sale. But none of this undisputed testimony bears upon the question of what representations, if any, were made by Consolidated's salesman, Plzak, to the officials of Spartan Aircraft Company and their reliance on such representations, if any.

The Trial Judge has made several findings bearing upon the question of express warranties. For instance, he finds that: "15. No express affirmation of fact relating to the insulating value or characteristics of the 'Consoweld' flooring, upon which reliance was placed by defendant in purchasing such flooring, was made to defendant by plaintiff's representatives."

Further, he finds: "23. Defendant did not purchase the material in reliance upon any statements of plaintiff's agent or employees with respect to the insulating characteristics of said material."

These and similar findings are attacked by Spartan as being without adequate basis in fact. They dispose of the buyer's contentions that seller breached any express warranties or that it is liable for misrepresentations in the nature of fraud under the Oklahoma statute. We shall proceed to see whether the findings are supported by the evidence.

The long record presents the type of contradictory stories by witnesses which are commonplace in cases of collision of vessels at sea and automobile accidents. Judges dealing constantly with the latter have said they never heard of a collision in which the defendant, according to his story, was going more than fifteen miles an hour. Every federal trial judge has sat in maritime collision cases where, if witnesses for the respondent's side were believed, the conduct of the navigation of the accused ship would make a model for beginners in that difficult art. So, here, plaintiff's witnesses have testified repeatedly that Plzak made representations which included statements that the Consoweld material had remarkable in-

5. Cancellation was in accordance with the terms of the order which provided: "This purchase order subject to cancellation by Spartan at any time during the life of the order, at no cost or liability to Spartan, by giving 30 days written notice to vendor."

6. 15 Okla.Stats.Ann. § 58 (1941).

sulating qualities and that they, the officials in charge of Spartan, knowing nothing of the matter relied completely upon those representations. Perhaps the Trial Judge felt as the Queen when she told her son Hamlet "The lady doth protest too much, methinks." [7]

On the other hand, the salesman, Plzak, was equally firm that he made no representations about the insulating qualities of Consoweld. Spartan says that Plzak is unworthy of belief. It devotes considerable effort to pointing out alleged inconsistencies in the story he told. This is a matter perfectly appropriate to argue to the trier of fact. But a conclusion reached by that trier is one with which an appellate court must be very careful in interfering. The statement in Rule 52(a) is not simply a precatory one, we think. And the policy back of that rule is especially appropriate where the point at issue is not that of inference from established facts, but whether witness A or witness B is telling the truth. We are quite conscious of our power to override the findings of a trial judge if, on the whole, we are convinced that a mistake has been made. United States v. United States Gypsum Company, 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.

We are here far from convinced that any mistake was made. Indeed, there is circumstantial evidence indicating that what the builders of these trailers had in mind was a substitution of this new material for the plywood, but not its substitution for the entire bottom of the trailer house consisting of (a) flooring, (b) the insulation and (c) the sheathing material below the insulation. The Trial Judge found: "12. Defendant, after placing the original order, contemplated the application of the plastic material as a substitute for plywood or center match wood flooring, and designed a floor plan incorporating the same insulation and other material as sub-structure, as theretofore had been used."

This is borne out by the fact that upon the floor of the defendant's factory a layout was constructed in which the Consoweld was put upon the top of wooden strips with layers of insulating material between the strips. It was the buyer's President, Mr. Getty, not its production man or its purchasing agent who gave the order to put the Consoweld directly on top of the metal frame.

There is further circumstantial evidence corroborating the Trial Judge's fact conclusion in the way the buying and selling between the parties terminated. There was no charge of misrepresentation in the buyer's notice of cancellation or in the correspondence which followed. The buyer suggested arbitration of the matter when the balance of the purchase price was asked for by the seller. But there was no charge by the buyer that the seller had done it wrong misrepresenting the merchandise. The failure of the seller to arbitrate has been talked about in the briefs in this appeal. We do not take that argument seriously. A party who has not agreed to arbitrate violates no legal duty that we know of in failing to take arbitration in substitution of the ordinary litigation process, and therefore no inference is to be drawn from his refusal to arbitrate.

Our conclusion on this phase of the matter is that there is no basis for a reversal of the Trial Judge. Our own examination of the long record satisfies us that his findings are abundantly supported by the evidence.

There should be further mention, however, of the point of implied warranty of fitness codified in the Uniform Sales Act.[8] In view of the Trial Judge's findings that Spartan did not contemplate using the Consoweld as flooring without insulation at the time of its dealings with Consolidated, and that Spartan did not rely on the seller's skill and judgment in that respect, which

---

7. Hamlet, Act III, Scene 2.

8. Uniform Sales Act § 15 (1); Wisconsin Statutes, Sec. 121.15 (1949). The Uniform Sales Act has not been adopted in Oklahoma, but an examination of Oklahoma cases indicates that its law is the same as that set forth in § 15 (1) insofar as it applies to this case. See Wood & Co. v. Val Blatz Brewing Co., 1925, 112 Okl. 119, 240 P. 115; Wallace v. L. D. Clark & Sons, 1918, 74 Okl. 208, 174 P. 557, 21 A.L.R. 361.

we find to be adequately supported by the evidence, we do not see how there was any implied warranty that Consoweld was fit for use without insulation. Since Spartan made it known to Consolidated that it intended to use Consoweld as a substitute for plywood, the most there could be is implied warranty that it was fit 'for that purpose, that is, as flooring with the usual insulation beneath.[9] But we are not convinced that this material was unfit to use as flooring if it had been used in the way the Trial Judge found the parties contemplated it in the beginning. It is true that there is some testimony which might lead to a contrary conclusion. Spartan offered evidence from members of its service crews that these crews had visited trailer owners during the winter of 1946-1947 and had insulated the trailers which had been sold without floor insulation. There is testimony that even after insulation they were not comfortable. But there is also testimony, offered by Consolidated, that there were many other complaints about Spartan trailers made by users in addition to complaints about the floors. It is not at all clear that all the trouble in this experimental stage of trailer building in a new type of design came alone from floors that were too cold. Spartan offered testimony of one of its people who had conducted tests of trailer temperatures in Colorado Springs, Duluth and Winnipeg, etc. The testimony was that Spartan trailers in temperatures far below zero were considerably lacking in comfort when they were equipped with Consoweld floors. The Trial Judge asked this witness, whose name was Kahn, whether he saw other people in other trailers when he went on this trip. The witness said he did.

Said the Court: "Were others comfortable?"

The Witness: "No, Sir."

The Court: "None of them?"

The Witness: "No, Sir."

Whether a trailer without a foundation, a heated basement and central heat can be made comfortable in bitter weather in Winnipeg, Manitoba, we do not pretend to know. But we do not think that the trouble which the Spartan people had with its trailers during the winter of 1946-1947 can be attributed to the lack of fitness of Consoweld as flooring material so as to create a breach of implied warranty of fitness on the part of the seller.

The judgment will be affirmed.

9. In the opinion below it is stated that "The testimony does not convincingly show that plaintiff was informed by defendant that it sought a substitute for plywood which would have insulating qualities equivalent to those of plywood plus insulation as theretofore used by defendant, or equivalent to those of plywood alone." This statement is borne out by evidence in the record, and would itself answer the implied warranty contention.